## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CESIDIO PALMIERI, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-1149 (JCH) |
| v. | : | |
| | : | |
| CITY OF HARTFORD, | : | MAY 31, 2013 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 39) and PLAINTIFF'S MOTION FOR PERMISSION TO FILE A SUR-REPLY BRIEF (Doc. No. 55)**

## I.    INTRODUCTION

Plaintiff Cesidio Palmieri brings this action against the defendant, the City of Hartford, in connection with the termination of Palmieri's employment as a Hartford police officer.  Palmieri brings five causes of action: disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; retaliation in violation of the ADA; interference with the exercise of rights under, and discrimination and retaliation in violation of, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; disability discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a); and retaliation in violation of CFEPA.  The City of Hartford filed this Motion for Summary Judgment (Doc. No. 39) as to all claims against it.  Palmieri has also filed a Motion for Permission to File a Sur-Reply Brief (Doc. No. 55).

For the following reasons, the Motion for Summary Judgment is granted in part and denied in part.  The Motion for Permission to file a Sur-Reply Brief is granted.

## II.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 252 (1986)) (stating that a non-moving party must point to more than a mere

"scintilla" of evidence in order to defeat a motion for summary judgment).

## III.   FACTUAL BACKGROUND

Palmieri entered the City of Hartford police academy as a new recruit on May 2,

2008.  Defendant's Local Rule 56(a)(1) Statement ("Def.'s 56(a)(1)") (Doc. No. 39-1) at

¶ 1; Plaintiff's Local Rule 56(a)(2) Statement ("Pl.'s 56(a)(2)") (Doc. No. 46-3) at ¶ 1.

The academy ended, and Palmieri was appointed to a class position as a probationary

police officer, on November 14, 2008.  Def.'s 56(a)(1) at ¶ 2; Pl.'s 56(a)(2) at ¶ 2;

Palmieri Deposition ("Pl. Depo.") (Doc. No. 39-3, Ex. 17) at 11.[1]  As a probationary

police officer, Palmieri was subject to the progressive discipline policy used by the

police department. Pl.'s 56(a)(2), Disputed Facts ¶ 3; Defendant's Reply Brief in Support

of Motion for Summary Judgment ("Def.'s Reply") (Doc. No. 54) at 17.  Palmieri's

position consisted of being a patrol officer on the 11:00 p.m. to 7:00 a.m. shift in the

North End of Hartford.  Def.'s 56(a)(1) at ¶ 3; Pl.'s 56(a)(2) at ¶ 3.  Palmieri's job as a

patrol officer consisted of responding to 911 calls and backing up other officers

responding to calls.  Def.'s 56(a)(1) at ¶ 4; Pl.'s 56(a)(2) at ¶ 4.  As part of the job as

patrol officer, Palmieri might have to restrain or handcuff people.  Def.'s 56(a)(1) at ¶ 5;

Pl.'s 56(a)(2) at ¶ 5.  As part of the job as patrol officer, Palmieri would get in and out of

his car for calls up to 50 times per night.  Def.'s 56(a)(1) at ¶ 6; Pl.'s 56(a)(2) at ¶ 6.  As

part of his job as patrol officer, Palmieri needed to be able to lift a variety of things,

---

[1] For the sake of clarity, and because different excerpts of depositions are introduced in different filings, the court will use the pagination of the deposition transcript itself, not the pagination as appears in the electronic filing system.

3

including his police bag and prisoners, and he might have to push things such as cars. Def.'s 56(a)(1) at ¶ 7; Pl.'s 56(a)(2) at ¶ 7.

Pursuant to City policy, members of a new police class serve a one year period of probation starting on the date of their class appointment.  Def.'s 56(a)(1) at ¶ 8; Pl.'s 56(a)(2) at ¶ 8.  The parties dispute whether all police officers are required to qualify their weapons quarterly.  Def.'s 56(a)(1) at ¶ 9; Pl.'s 56(a)(2) at ¶ 9.[2]  The Hartford Police Department Policy and Procedure Number 8-6 provides that, "[a]ll sworn personnel must demonstrate proficiency with the Department issued service handgun by attending training/qualification once each calendar quarter by firing 120 rounds of ammunition in a prescribed course."  Def.'s 56(a)(1) at ¶ 10.[3]  The Hartford Police Department Policy and Procedure Number 8-6 also provides that, "[s]worn personnel must report to the range each quarter for qualification purposes in accordance with scheduled range times."[4]  Def.'s 56(a)(1) at ¶ 11.  The parties dispute whether Palmieri was required to qualify his weapon sometime between January 1, 2009 and March 30, 2009, and whether this requirement meant that Palmieri had to contact the Range

---

[2] Palmieri's 56(a)(2) Statement is not entirely responsive to this asserted fact.  Defendant's 56(a)(1) Statement reads, "Pursuant to a [sic] Section 10-5 of the Consent Decree in the case Cintron v. Vaughn, Civil Action Number 13, 587, all police officers are required to qualify their weapons quarterly." Def.'s 56(a)(1) at ¶ 9.  It is clear that the attached consent decree does so provide.  Def.'s 56(a)(1) at Ex.1 (Doc. No. 39-3) at 12.  Palmieri cites the deposition of Lieutenant Peter Bergenholtz in which Bergenholtz states that in some situations an officer can be excused from qualifying his firearm.  Pl.'s 56(a)(1)  at Ex. C (Doc. No. 47-2) at 18.

[3] Palmieri's 56(a)(2) Statement is not responsive to this asserted fact.  He objects on the grounds that Bergenholtz testified that a customary policy of the police department is that, in certain situations, not all officers must qualify their weapons quarterly.  Pl.'s 56(a)(2) at ¶ 10.  Palmieri offers no evidence that Policy and Procedure 8-6 does not say what the City of Hartford says it does.

[4] Palmieri's 56(a)(2) Statement is not responsive to this asserted fact.  He objects on the grounds that Bergenholtz testified that a customary policy of the police department is that, in certain situations, not all officers must qualify their weapons quarterly.  Pl.'s 56(a)(2) at ¶ 11.  Palmieri offers no evidence that Policy and Procedure 8-6 does not say what the City of Hartford says it does.

4

master to set up a time to perform the qualification test.  Def.'s 56(a)(1) at ¶ 12, 13; Pl.'s 56(a)(2) at ¶ 12, 13.

Palmieri was absent from work on March 20, 2009 and March 21, 2009.  Def.'s 56(a)(1) at ¶ 14; Pl.'s 56(a)(2) at ¶ 14.  While driving to work for his March 22, 2009 shift, Palmieri experienced a back problem and returned home.  Def.'s 56(a)(1) at ¶ 15; Pl.'s 56(a)(2) at ¶ 15.  Although Palmieri's injury occurred while driving to work, he filed a claim alleging that it was a work-related injury.  Def.'s 56(a)(1) at ¶ 16; Pl.'s 56(a)(2) at ¶ 16.  Palmieri called in sick for the March 22, 2009 shift.  Def.'s 56(a)(1) at ¶ 17; Pl.'s 56(a)(2) at ¶ 17.  Palmieri informed the City of Hartford of his injury by calling the front desk of the police department and an officer filled out a report after Palmieri reported his injury.  Pl.'s 56(a)(2), Disputed Facts ¶ 6, Def.'s Reply at 17.  Palmieri also claimed the injury to worker's compensation.  Id.

Palmieri went to the hospital for treatment, as well as other doctors including an orthopedic doctor, chiropractor, and physical therapist.  Pl.'s 56(a)(2), Disputed Facts ¶ 7, Def.'s Reply at 17.  Palmieri was diagnosed with degenerative disc disease, with herniated disc and lumbar instability at L4-L5.  Pl.'s 56(a)(2), Disputed Facts ¶ 8, Def.'s Reply at 17.  Palmieri had to miss several days of work due to back pain, which prohibited him from sitting, made walking difficult, and at times was incapacitating.  Pl.'s 56(a)(2), Disputed Facts ¶ 9, Def.'s Reply at 17.  Palmieri had prior back problems in 2007.  Pl.'s 56(a)(2), Disputed Facts ¶ 5; Def.'s Reply at 17.

Palmieri failed to qualify his weapon prior to March 30, 2009.  Def.'s 56(a)(1) at ¶ 18; Pl.'s 56(a)(2) at ¶ 18.  The parties dispute whether Palmieri contacted anyone to determine whether the weapon qualification course could be modified to meet Palmieri's

physical needs and/or whether he could be excused from qualification because of his injury.  Def.'s 56(a)(1) at ¶ 19; Pl.'s 56(a)(2) at ¶ 19.  On April 9, 2009, the plaintiff was released to return to work on what his doctor referred to as "light duty."  Def.'s 56(a)(1) at ¶ 20; Pl.'s 56(a)(2) at ¶ 20.  The only medical restriction the doctor imposed was a twenty pound lifting restriction.  Def.'s 56(a)(1) at ¶ 21; Pl.'s 56(a)(2) at ¶ 21.  The doctor did not specifically restrict Palmieri from shooting his weapon, although Palmieri asserts that the duty belt that patrol officers are required to wear (and which contain the service weapon) weighs over 20 pounds (and would thus run afoul of the doctor's restriction.  Def.'s 56(a)(1) at ¶ 22; Pl.'s 56(a)(2) at ¶ 22.  The City of Hartford's practice is to find a light duty position when an employee needs it, even if the injury is not work related.  Pl.'s 56(a)(2), Disputed Facts ¶ 10, Def.'s Reply at 17.

In keeping with Palmieri's temporary medical needs, he was assigned to work at the front desk of the police complex.  Def.'s 56(a)(1) at ¶ 23; Pl.'s 56(a)(2) at ¶ 23.  In this position, Palmieri's duties consisted of answering phones and taking reports.  Def.'s 56(a)(1) at ¶ 24; Pl.'s 56(a)(2) at ¶ 24.  While at the front desk, Palmieri was required to wear his duty belt, which included his service weapon.  Def.'s 56(a)(1) at ¶ 25; Pl.'s 56(a)(2) at ¶ 25.  Pursuant to Hartford Policy and Procedure 8-6, Palmieri was required to carry his service weapon while on duty at the front desk.  Def.'s 56(a)(1) at ¶ 26; Pl.'s 56(a)(2) at ¶ 26.

Police officers are provided a mailbox through which work related information is provided to them.  Def.'s 56(a)(1) at ¶ 27; Pl.'s 56(a)(2) at ¶ 27.  Palmieri worked from April 16, 2009 to April 20, 2009.  Def.'s 56(a)(1) at ¶ 28; Pl.'s 56(a)(2) at ¶ 28.  From April 16, 2009 through April 20, 2009 Palmieri never qualified with his service weapon or

made any request to be excused from the qualification.  Def.'s 56(a)(1) at ¶ 29; Pl.'s 56(a)(2) at ¶ 29.  On April 23, 2009, Palmieri's doctor indicated that Palmieri was unable to return to work until further notice.  Pl.'s 56(a)(2), Disputed Facts ¶ 11, Def.'s Reply at 17.

On April 20, 2009, Bergenholtz issued Palmieri a letter, by placing the letter in Palmieri's mailbox on that date, indicating that an audit of the training records showed that Palmieri did not qualify with his service weapon during the first quarter of 2009 and requiring that he "submit a report explaining why you failed to qualify with your weapon. Include any documentation which may have excused you from qualifying during that period."  Def.'s 56(a)(1) at ¶ 30, 31; Pl.'s 56(a)(2) at ¶ 30, 31.  The letter further stated, "Be advised, information learned during the course of the investigation may lead to disciplinary action against you."  Def.'s 56(a)(1) at ¶ 30; Pl.'s 56(a)(2) at ¶ 30.  The parties dispute whether Palmieri responded to Bergenholtz's letter.  Def.'s 56(a)(1) at ¶ 32; Pl.'s 56(a)(2) at ¶ 32.  The parties agree that on September 26, 2009, Palmieri wrote a report for Bergenholtz explaining why Palmieri had been unable to qualify his weapon. Pl.'s 56(a)(2), Disputed Facts ¶ 61, Def.'s Reply at 17.

On May 7, 2009 Bergenholtz issued a second letter to Palmieri containing similar language to the first letter, although the parties dispute whether this letter was issued to Palmieri directly or was given to Palmieri's patrol commander.  Def.'s 56(a)(1) at ¶ 33; Pl.'s 56(a)(2) at ¶ 33.  The parties dispute whether Palmieri responded to Bergenholtz's letter by giving his documentation to another officer and writing a letter on September 26, 2009.  Def.'s 56(a)(1) at ¶ 34; Pl.'s 56(a)(2) at ¶ 34.  Palmieri alleges that from

March 22, 2009 through May 15, 2009 he failed to check his mailbox and was unaware of the two letter orders from Bergenholtz.  Def.'s 56(a)(1) at ¶ 35; Pl.'s 56(a)(2) at ¶ 35.

On May 15, 2009, Palmieri attended a "give back" day, where officers attend training on a specific topic.  Def.'s 56(a)(1) at ¶ 36; Pl.'s 56(a)(2) at ¶ 36.  At the start of that day, Bergenholtz verbally ordered Palmieri to provide a written explanation to him before the end of the day explaining why Palmieri had failed to qualify his weapon.  Def.'s 56(a)(1) at ¶ 37; Pl.'s 56(a)(2) at ¶ 37.  Palmieri indicated that he would provide that information by the end of the day.  Def.'s 56(a)(1) at ¶ 38; Pl.'s 56(a)(2) at ¶ 38.  The parties dispute whether Palmieri failed to provide Bergenholtz at the end of the day with the requested documentation, or whether Palmieri, unable to locate Bergenholtz, gave the information to another officer to give to Bergenholtz.  Def.'s 56(a)(1) at ¶ 39; Pl.'s 56(a)(2) at ¶ 39.  Palmieri alleges that he gave the information to Officer Suarez and asked her to give it to Bergenholtz because Palmieri could not locate Bergenholtz.  Def.'s 56(a)(1) at ¶ 40; Pl.'s 56(a)(2) at ¶ 40.  Palmieri did not follow up with Bergenholtz to make sure he had received the information.  Def.'s 56(a)(1) at ¶ 41; Pl.'s 56(a)(2) at ¶ 41.  Palmieri assumed that, if Bergenholtz did not receive the requested information, Bergenholtz would contact him as to why he had not followed the order.  Def.'s 56(a)(1) at ¶ 42; Pl.'s 56(a)(2) at ¶ 42.

On May 12, 2009, Palmieri's doctor indicated that Palmieri was able to return to work on May 16, 2009, to do sedentary work.  Pl.'s 56(a)(2), Disputed Facts ¶ 13, Def.'s Reply at 17.  On May 18, 2009, Palmieri's doctor indicated that Palmieri was unable to return to work.  Pl.'s 56(a)(2), Disputed Facts ¶ 14, Def.'s Reply at 17.  The pain

8

persisted and Palmieri's doctor recommended surgery.  Pl.'s 56(a)(2), Disputed Facts ¶ 15, Def.'s Reply at 17.

On or about June 1, 2009, Palmieri alleges he provided the human resources department of the police department with Form WH-380, indicating that he needed approximately six months of leave starting retroactively on March 22, 2009, pending possible surgery.  Def.'s 56(a)(1) at ¶ 43; Pl.'s 56(a)(2) at ¶ 43.  Palmieri spoke with Colleen Kenton regarding the forms, and Kenton told Palmieri that "these forms will save your job."  Pl.'s 56(a)(2), Disputed Facts ¶ 18, Def.'s Reply at 17.  Kenton and Assistant Chief McCoy were responsible for forwarding the documents to the City of Hartford's Human Resources Department.  Pl.'s 56(a)(2), Disputed Facts ¶ 19, Def.'s Reply at 17.  The report indicated that Palmieri was not allowed any work at all during that time period.  Id.  On June 4, 2009, Palmieri filled out a leave request asking for leave retroactively from March 22, 2009, through the unknown date of his surgery.  Def.'s 56(a)(1) at ¶ 44; Pl.'s 56(a)(2) at ¶ 44.  Palmieri does not have any documents indicating that his FMLA request for leave, or that his request for extended sick leave without pay, was approved.  Def.'s 56(a)(1) at ¶ 45, 46; Pl.'s 56(a)(2) at ¶ 45, 46.  The parties dispute whether Palmieri ever followed up with anyone at the City of Hartford to determine if the leave request had been approved.  Def.'s 56(a)(1) at ¶ 47; Pl.'s 56(a)(2) at ¶47.  On June 1, 2009, Palmieri's doctor, Robert V. Dawe, MD completed an FMLA certification of Health Care Provider, indicating that Palmieri was not to be working from March 22, 2009, to his surgery, and Palmieri provided those documents to Kenton in the Human Resources Department.  Pl.'s 56(a)(2), Disputed Facts ¶ 20, Def.'s Reply at 17.  Information and/or policies under the FMLA were not posted at the Hartford Police

Department.  Pl.'s 56(a)(2), Disputed Facts ¶ 24, Def.'s Reply at 17.  The City of

Hartford's Director of Human resources stated that, if an FMLA request was denied or if

the employee was ineligible for FMLA, the City of Hartford would send out a letter.  Pl.'s

56(a)(2), Disputed Facts ¶ 25, Def.'s Reply at 17.

On August 6, 2009, Palmieri underwent surgery.  Def.'s 56(a)(1) at ¶ 48; Pl.'s

56(a)(2) at ¶ 48.  At the end of August 2009, Palmieri was informed that he would no

longer be eligible for city-funded health insurance if he did not return to work.  Def.'s

56(a)(1) at ¶ 49; Pl.'s 56(a)(2) at ¶ 49.  In early September 2009, Palmieri was cleared

to return to work and did return to work, although the parties dispute whether he

returned to work with a restriction of no lifting or of sedentary work only with no lifting

greater than seven pounds and no wearing of a duty belt.  Def.'s 56(a)(1) at ¶ 50; Pl.'s

56(a)(2) at ¶ 50.  Because he could not wear his duty belt, Palmieri could no longer

work at the front desk and was therefore assigned to the fleet office.  Def.'s 56(a)(1) at ¶

51; Pl.'s 56(a)(2) at ¶ 51.  At the fleet office, Palmieri's duties consisted solely of

checking mileage on police vehicles and documenting if any work needed to be done on

the vehicles.  Def.'s 56(a)(1) at ¶ 52; Pl.'s 56(a)(2) at ¶ 52.

In early September 2009, Palmieri authorized his healthcare providers to release

his medical information to Kenton.  Pl.'s 56(a)(2), Disputed Facts ¶ 33, Def.'s Reply at

17.  The City of Hartford received the medical records.  Pl.'s 56(a)(2), Disputed Facts ¶

41, Def.'s Reply at 17.

On September 25, 2009, Bergenholtz learned that Palmieri had returned to work

and issued him a fourth order requiring him to "submit a report explaining why you failed

to qualify with your weapon.  Include any documentation which may have excused you

from qualifying during that period." Def.'s 56(a)(1) at ¶ 53; Pl.'s 56(a)(2) at ¶ 53.  On

September 25, 2009, Palmieri met with Lieutenant Bernier, the police advocate,

regarding potential discipline for failing to respond to Bergenholtz's orders.  Def.'s

56(a)(1) at ¶ 54; Pl.'s 56(a)(2) at ¶ 54.  Palmieri told Bernier that he would get the

requested report to Bergenholtz on September 28, 2009.  Id.  Bernier verbally ordered

Palmieri to provide the report to Bergenholtz on September 28, 2009.  Def.'s 56(a)(1) at

¶ 55; Pl.'s 56(a)(2) at ¶ 55.  On September 28, 2009, Palmieri went to see the union

representative, Sargent Holton, who told him to wait to give the letter to Bergenholtz

because he wanted to revise it.  Pl.'s 56(a)(2), Disputed Facts ¶ 63, Def.'s Reply at 17.

Palmieri did not get the report to Bergenholtz on September 28, 2009.  Def.'s 56(a)(1) at

¶ 57; Pl.'s 56(a)(2) at ¶ 57.  On September 28, 2009, Bernier met with Palmieri

regarding why he had not followed orders and provided the required documentation on

that date.  Def.'s 56(a)(1) at ¶ 58; Pl.'s 56(a)(2) at ¶ 58.  Palmieri showed Bernier a

letter he had written and told Bernier that he would give the letter to Bergenholtz.  Id.

Palmieri provided the letter to Bergenholtz on September 29, 2009.  Def.'s 56(a)(1) at ¶

59; Pl.'s 56(a)(2) at ¶ 59.  In late September 2009, while Palmieri was explaining to

Bernier why Palmieri did not qualify his weapon, Bernier stated, "I'm tired of hearing

about your back."  Pl.'s 56(a)(2), Disputed Facts ¶ 35, Def.'s Reply at 17.  Palmieri was

told by Bernier that Bergenholtz wanted to suspend Palmieri.  Pl.'s 56(a)(2), Disputed

Facts ¶ 36, Def.'s Reply at 17.  Palmieri asserts that he did not receive the first two

directives from Bergenholtz, dated April 20, 2009 and May 7, 2009.  Pl.'s 56(a)(2),

Disputed Facts ¶ 57.  Palmieri wrote a letter to Bernier explaining that he had not given

the letter to Bergenholtz because he was waiting for further instruction from Holton. Pl.'s 56(a)(2), Disputed Facts ¶ 64, Def.'s Reply at 17.

On September 29, 2009, Bernier wrote to the Chief of Police to inform him of Palmieri's insubordination and requested that the Chief, "Please take these incidents of insubordination into account when considering [Palmieri's] final probationary review." Def.'s 56(a)(1) at ¶ 60; Pl.'s 56(a)(2) at ¶ 60.  Bergenholtz did not take any disciplinary action between May 15, 2009, and September 2009, and only completed a disciplinary report regarding Palmieri's behavior after receiving the letter Palmieri had written to him describing why Palmieri had been unable to qualify his weapon.  Pl.'s 56(a)(2), Disputed Facts ¶ 68, Def.'s Reply at 17.  Bernier recommended a five day suspension due to Palmieri's failure to follow at least the first two directives.  Pl.'s 56(a)(2), Disputed Facts ¶ 71, Def.'s Reply at 19.  Chief Roberts did not see Bernier's recommendation of suspension, but was aware of why Palmieri was absent.  Pl.'s 56(a)(2), Disputed Facts ¶ 72, Def.'s Reply at 17.

Bergenholtz know that Palmieri had suffered a back injury.  Pl.'s 56(a)(2), Disputed Facts ¶ 69, Def.'s Reply at 17.  In the past, Bergenholtz failed to qualify his weapon once due to an injury, but he was not disciplined.  Pl.'s 56(a)(2), Disputed Facts ¶ 70, Def.'s Reply at 17.

Palmieri was issued a Probationary Employee Performance Evaluation dated October 13, 2009, that showed that his performance "indicates a need for improvement in the factors described below."  Def.'s 56(a)(1) at ¶ 61; Pl.'s 56(a)(2) at ¶ 61.  On October 15, 2009 the Chief of Police terminated Palmieri's employment effective October 30, 2009.  Def.'s 56(a)(1) at ¶ 62; Pl.'s 56(a)(2) at ¶ 62.

During the meeting with the Chief of Police, in which meeting Palmieri was terminated, Palmieri attempted to explain that he had been absent due to a medical condition and because of the medical condition and the absences he was unable to qualify his weapon, but did the best he could and performed a semi-qualification. Pl.'s 56(a)(2), Disputed Facts ¶ 43, Def.'s Reply at 17.  The Chief of Police stated that he "didn't care about [Palmieri's] back injuries," that Palmieri was "never fit to be a cop," and that the Chief of Police does not need cops behind desks but needs them on the streets.  Id.  The Chief of Police also told Palmieri, "don't even think about collecting unemployment," "You don't like going to work," and "I heard you have no money so if you want your last paycheck hand in your uniform."  Id.  Palmieri was informed that the reasons for his termination included absences, his failure to qualify his weapon, and his failure to follow directives to explain why he had not qualified his weapon.  Pl.'s 56(a)(2), Disputed Facts ¶ 44, Def.'s Reply at 18.  Palmieri did not receive other disciplinary action or fail to follow other directives than those relating to qualifying his weapon.  Pl.'s 56(a)(2), Disputed Facts ¶ 45, Def.'s Reply at 17.

Chief Daryl Roberts stated that the reasons for Palmieri's absences would not have affected his decision to terminate Palmieri and that he relied on Palmieri's performance evaluation in determining to terminate him.  Pl.'s 56(a)(2), Disputed Facts ¶ 46, 47, Def.'s Reply at 17.  Chief Roberts further stated that he could not accept Palmieri not following directives because of his absences, even if those absences were approved. Pl.'s 56(a)(2), Disputed Facts ¶ 49, Def.'s Reply at 17.

The parties dispute whether, or when, Palmieri contacted the Range Master regarding Palmieri's weapon qualification, although such contact could not have taken

place before September 2009.  Def.'s 56(a)(1) at ¶ 63; Pl.'s 56(a)(2) at ¶ 63.  Palmieri

did not ask whether he could postpone qualification of his weapon, although Palmieri

asserts that he did ask an officer named Crabtree after September 2009, if Palmieri

could do anything to help his case and Crabtree permitted Palmieri to perform a "semi-

qualification."  Def.'s 56(a)(1) at ¶ 64; Pl.'s 56(a)(2) at ¶ 64; Pl.'s 56(a)(2), Disputed

Facts ¶ 37, Def.'s Reply at 17.  Crabtree stated that Palmieri could not qualify his

weapon because qualification required Palmieri to bend and lay on the ground.   Pl.'s

56(a)(2), Disputed Facts ¶ 38, Def.'s Reply at 17.  Crabtree called Bergenholtz on his

cell phone and told him that Palmieri was at the range requesting to qualify, but that

Palmieri was unable to do so because of his injury.  Pl.'s 56(a)(2), Disputed Facts ¶ 39,

Def.'s Reply at 17.  Crabtree permitted Palmieri to fire 30 rounds, which did not require

bending or laying on the ground.  Pl.'s 56(a)(2), Disputed Facts ¶ 40, Def.'s Reply at 17.

Crabtree inserted this information into a computer and printed out a certification for

Palmieri to sign, stating that he had just performed a semi-qualification.  Id.  Palmieri's

copy of the certification was kept at his desk, and he was unable to retrieve it following

his termination.  Id.

Palmieri did not ask for an accommodation specifically with regard to qualifying

his weapon although Palmieri asserts that he asked for a reasonable accommodation

as to all of his job duties in the form of a leave of absence.  Def.'s 56(a)(1) at ¶ 65; Pl.'s

56(a)(2) at ¶ 65.

On October 30, 2009, Palmieri's probationary period ended.  Def.'s 56(a)(1) at ¶

66; Pl.'s 56(a)(2) at ¶ 66.  The parties dispute whether from March 22, 2009 on Palmieri

was able to perform the essential functions of his job as a patrol officer with or without reasonable accommodation.  Def.'s 56(a)(1) at ¶ 67; Pl.'s 56(a)(2) at ¶ 67.

Palmieri has fully recovered from his back surgery.  Def.'s 56(a)(1) at ¶ 68; Pl.'s 56(a)(2) at ¶ 68.  On September 1, 2009, Doctor Gerard J. Girasole indicated that he estimated that Palmieri would be back to work within three months.  Pl.'s 56(a)(2), Disputed Facts ¶ 73, Def.'s Reply at 17.  On November 16, 2009 Girasole indicated Palmieri could return to work, and he made a similar indication on February 8, 2010.  Pl.'s 56(a)(2), Disputed Facts ¶ 74, Def.'s Reply at 17.  By March 2010, Palmieri had no restrictions for his back injury.  Def.'s 56(a)(1) at ¶ 69; Pl.'s 56(a)(2) at ¶ 69.  The parties dispute whether, at the time of dismissal, Palmieri could perform the essential functions of his position as a patrol officer, although Palmieri asserts that he would have been able to perform all of these functions if the City of Hartford had given him an accommodation of light duty and/or a leave of absence to fully recover from surgery.  Def.'s 56(a)(1) at ¶ 70; Pl.'s 56(a)(2) at ¶ 70.

Chief Roberts stated that an officer's probationary period could be extended.  Pl.'s 56(a)(2), Disputed Facts ¶ 76, Def.'s Reply at 17.  Palmieri had worked the required 1,250 hours within a twelve month period to be eligible under the FMLA as of May 2, 2008.  Pl.'s 56(a)(2), Disputed Facts ¶ 77, Def.'s Reply at 17.

## IV.   DISCUSSION

Palmieri has brought five claims against the City of Hartford: disability discrimination and retaliation in violation of the ADA, disability discrimination and

retaliation in violation of CFEPA, and retaliation in violation of the FMLA.[5]

   A.  ADA: Disability Discrimination

   The ADA provides, inter alia, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  See 42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009).  Under this framework, a plaintiff must first establish a prima facie case of discrimination.  See Stephan v. West Irondequoit Cent. School Dist., 450 Fed.Appx. 77, 79 (2d Cir. 2011).  Once a plaintiff has established this prima facie case, the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question.  Id.  If the employer does so, the burden then returns to the plaintiff to furnish evidence that the reason offered by the employer is a pretext.  Id.

   The defendant argues that summary judgment must be granted on Count One because Palmieri cannot establish a prima facie case under 42 U.S.C. § 12112(a).  To establish such a case, Palmieri must show that "(1) his employer is subject to the ADA;

---

[5] There is some confusion from the pleadings as to the nature of Palmieri's FMLA claim.  The Complaint (Doc. No. 1) asserts a single FMLA count based on interference, discrimination, and retaliation.  Compl. at Third Count.  The City of Hartford's arguments in support of its Motion for Summary Judgment treat the count in part as an FMLA interference count.  See Def.'s Memo. Supp. Mot. Summ. J. at 24.  Palmieri does not appear to advance the interference claim and asserts, "With regard to the FMLA, plaintiff's argument is that he was retaliated against for exercising his FMLA rights."  Plaintiff's Sur-Reply in Opposition to Motion for Summary Judgment ("Pl.'s Sur-Reply Opp. Mot. Summ. J.") (Doc. No. 56) at 4.  Accordingly, the court deems the FMA interference claim -- to the extent that it was alleged in the Complaint -- abandoned.  The court will only address the FMLA count in the context of a retaliation claim.

16

(2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). There is no dispute that the City of Hartford is subject to the ADA, or that Palmieri suffered an adverse employment action.

    1.   Whether Palmieri Was "Disabled"

    The court first considers whether Palmieri was "disabled" within the meaning of the ADA. The ADA defines disability as either, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The City of Hartford argues that Palmieri's back injury does not qualify as a disability because it was a temporary condition, lasting from March 2009 to, at the latest, March 2010, at which time, Palmieri later testified at his deposition, he had completely recovered from his back injury. See Def.'s Memo. Supp. Mot. Summ. J. at 6. Palmieri argues that his back injury, diagnosed as "degenerative disc disease with herniated disc and lumbar instability at L4-L5," constitutes a disability, and that the condition is not temporary because he has a "20% permanent impairment rating," experienced back problems in 2007, and was noted to have residual back pain even while being cleared to return to work. See Pl.'s Memo. Opp. Mot. Summ. J. at 22-24.

    Courts apply a three-step approach to determine whether an individual is "disabled" within the meaning of the ADA. "[P]laintiff must first show that [ ]he suffers from a physical and mental impairment. Second, the plaintiff must identify the activity claimed to be impaired and establish that it constitutes a major life activity. Third, the

plaintiff must show that [his] impairment substantially limits the major life activity

previously identified."  Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 147 (2d

Cir. 2002) (internal quotations and citations omitted).

The court notes that the Second Circuit has determined that, "A 'temporary

impairment' lasting only a few months is, 'by itself, too short in duration . . . to be

substantially limiting.'"  De la Rosa v. Potter, 427 Fed.Appx. 28, 29 (2d Cir. 2011)

(quoting Adams v. Citizens Advice Bureau, 187 F.3d 315, 316-17 (2d Cir. 1999)).  While

this Circuit has explicitly deferred consideration of whether a temporary impairment is

per se unprotected under the ADA (see Adams, 187 F.3d at 317), this Circuit has stated

that an impairment of seven months, by itself, was too short to qualify as a disability.

See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998)

(superseded by statute on other grounds).  Here, Palmieri was injured in late March

2009, underwent surgery in August 2009, was terminated in October 2009, and by

March 2010 fully recovered from his back surgery and had no medically-imposed work

restrictions.  The court does not doubt that Palmieri has introduced evidence that he

had, and possibly still has, a physical impairment in the form of "degenerative disc

disease."  However, the terms "impairment" and "disability" are not equivalent; for an

individual to be disabled he must show that the impairment substantially limits a major

life activity, such as working.  This Palmieri has not done: the substantial limitation on

his ability to work has been resolved, and the parties do not dispute that he can work

once again.  See Def.'s 56(a)(1) at ¶ 69; Pl.'s 56(a)(2) at ¶ 69 ("By March 2010, the

plaintiff had no restrictions for his back injury."); see also Huskins v. Pepsi Cola of

Odgensburg Bottlers, Inc., 180 F.Supp.2d 347, 351-52 (N.D.N.Y. 2001) (holding that an

18

employee who had a shoulder injury which prevented him from performing his job duties for five months was not disabled under the ADA) (collecting cases).

Palmieri attempts to address this failing by arguing that he has introduced facts sufficient to show that his back injury is long-term, chronic, and likely to recur. "[P]laintiff's condition with his back was a long term chronic physical condition." Pl.'s Memo. Opp. Mot. Summ. J. at 22. The ADA does provide for a definition as "disabled" in certain situations even when the immediate substantial limitation has been resolved. "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Palmieri argues that his back injury is "episodic" because he experienced a back injury in 2007, and because his doctor noted that Palmieri experiences residual pain. Pl.'s Memo. Opp. Mot. Summ. J. at 22-23. However, no reasonable jury could find that, based on the evidence Palmieri submitted, that his injury was of a kind that it would reactivate in some manner and substantially limit a major life activity. Indeed, Palmieri's Affidavit merely states that, "I had had prior back problems in 2007." Palmieri Affidavit (Doc. No. 46-2) at ¶ 5. Further, to the extent that Palmieri claims that he experiences residual back pain, his doctor was aware of this residual pain and extended his 20 percent permanent partial disability rating while simultaneously clearing Palmieri for all duties. See Doc. No. 47-3 at 34. This evidence is simply insufficient to raise a material issue of fact as to whether Palmieri's temporary impairment was subject to reactivation that would substantially limit a major life activity: the residual pain did not substantially limit a major life activity. See Colwell, 158 F.3d at 646 ("[A] seven-month impairment of his ability to work, with the non-particularized and unspecific residual limitations described on his police work, is

of too short a duration and too vague an extent to be substantially limiting.") (internal quotations omitted); Roush v. Weastec, Inc., 96 F.3d 840, 844 (6th Cir. 1996) ("However, there is no evidence that this impairment presently substantially limits a major life activity within the meaning of the ADA.  Although plaintiff underwent a number of surgeries and medical procedures to correct her condition and her ability to work was substantially limited during that period, this does not lead to the conclusion that plaintiff presently has a disability.  Instead, it is undisputed that plaintiff's kidney is no longer obstructed and no longer affects her ability to work.  Because plaintiff's kidney condition was temporary, it is not substantially limiting and, therefore, not a disability under the ADA.  Further, the mere possibility that a kidney blockage will recur or that further surgery will be needed is not sufficient to establish that her condition is substantially limiting.").

Palmieri next argues, that even if his injury is not a "disability" under the ADA, he still survives summary judgment because a material issue of fact exists as to whether the City of Hartford regarded him as disabled.  See 42 U.S.C. § 12102(1).  "An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  In 2008, prior to the events at issue in this case, Congress amended the ADA, reducing the showing necessary to demonstrate a "regarded as" claim.  See Hilton v. Wright, 673 F.3d 120, 129 (2d Cir. 2012).  As a result of this change, plaintiffs need only demonstrate that the employer regarded them as impaired,

whether or not that impairment is believed to limit a major life activity. Id. "Although both parties thought that Hilton needed to demonstrate that the defendants regarded him as being substantially limited in a major life activity, it is clear that he was only required to raise a genuine issue of material fact about whether Dr. Wright and/or DOCS regarded him as having a mental or physical impairment. Hilton was not required to present evidence of how or to what degree they believed the impairment affected him." Id. This change calls into question the particular conclusions in the cases relied upon by the City of Hartford. See, e.g., Giordano v. City of New York, 274 F.3d 740, 748 (2d Cir. 2001) (holding that the plaintiff must show that defendants regarded him "as disabled within the meaning of the ADA," based on an analysis that section 12102 required defendants to regard the plaintiff as substantially limited in his ability to perform a major life activity) (emphasis omitted). The City of Hartford argues that the simple fact that it placed Palmieri on a light duty assignment is not equivalent to an admission that it regarded him as disabled or that Palmieri was physically impaired.[6] See Def.'s Memo. Supp. Mot. Summ. J. at 21; Piascyk v. City of New Haven, 64 F.Supp.2d 19, 34 n. 13 (D. Conn. 1999) ("[A]n employer that sensibly seeks to avoid litigation, liability and confrontation by 'acced[ing] to minor and potentially debatable accommodations' cannot be held to have thereby stipulated to the employee's status as an individual with a disability under the ADA.") (quoting Colwell, 158 F.3d at 646).

_____

[6] The City of Hartford, operating under the mistaken impression that a "regarded as" claim requires evidence concerning the defendant's perception of how the impairment in question affected a substantial life activity, does not specifically argue that its assignment of Palmieri to light duty does not constitute an admission that it regarded Palmieri as physically impaired. However, it is clear to the court that had it cited the proper standard it would have made this very similar argument. Accordingly, the court will address that issue.

Palmieri points primarily to the fact that he was given light duty work and a shortened leave of absence to support his claim that he was "regarded as" disabled. See Pl.'s Memo. Opp. Mot. Summ. J. at 24.  Palmieri further points to the comments made by Chief McCoy that he "didn't care about [Palmieri's] back injuries" and that Palmieri was "never fit to be a cop" as evidence sufficient to raise a material issue of fact that he was regarded as disabled.  Id.  While there is scant evidence in the record that Palmieri was placed on light duty for any reason other than the fact that he requested it, the comments made by Chief McCoy and Lieutenant Bernier could lead a reasonable jury to find that the City of Hartford regarded Palmieri as disabled.  While the comments are not entirely clear, and do not necessarily implicate any actions actually taken by defendants, the court cannot say that no material issue of fact exists as to their meaning.  This conclusion is further supported by the fact that neither party addressed whether these comments implicated an opinion on whether Palmieri had an impairment (as opposed to a disability) and by the fact that neither party has introduced evidence as to the relative role of the various officers in the ultimate termination decision. The court is also not in a position to rule on whether evidence was sufficient to demonstrate that these individuals' comments were sufficiently relevant under the ADA.  While no material issue of fact remains as to whether Palmieri was, in fact, disabled, under the lower standard for a "regarded as" claim, the court cannot say that no material issue of fact remains as to whether he was regarded as disabled.  The court will therefore proceed to the next ADA disability discrimination factor in dispute.

2.  Whether Palmieri was Otherwise Qualified

To establish a prima facie case of disability discrimination, Palmieri must also show that "he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation."  Shannon v. New York City Transit Authority, 332 F.3d 95, 99 (2d Cir. 2003).  "Essential functions are defined under [Equal Employment Opportunity Commission] regulations to mean the fundamental duties to be performed in the position in question, but not functions that are merely marginal."  Id. at 100 (internal quotations and citations omitted).  "In approaching this inquiry, '[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.'"  Id. (quoting D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998).  "A reasonable accommodation can never involve the elimination of an essential job function."  Id. (citing Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)).  The court notes that, while the Second Circuit has held that in certain limited circumstances involving totally disabled retired employees litigating over fringe benefits, an individual need not be otherwise qualified for his position under the ADA (see Castellano v. City of New York, 142 F.3d 58, 69-70 (2d Cir. 1998)), "[i]n most cases, the relevant date for determining whether an individual is qualified for her position is the date of the adverse employment decision."  Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 80 n.8 (1st Cir. 2010).

Before evaluating whether a material issue of fact exists as to whether Palmieri was otherwise qualified for his position, the court needs to identify what the essential functions of his position are.  This analysis is complicated by the fact that neither party enumerates with particularity what the essential functions of a patrol officer in Hartford

actually are, although Palmieri does not seem to contest that, at the time of his termination, he could not perform the essential functions of the position.  <u>See</u> Def.'s Memo. Opp. Mot. Summ. J. at 26 ("The evidence shows that had the defendant allowed him to remain in the light duty, within a month later, the plaintiff would have been able to perform and return to the positions [sic] of patrol officer.").  While the question of which functions are essential to a particular position is a heavily factual one, the court must give substantial deference to the employer's definition.  <u>See</u> <u>Shannon</u>, 332 F.3d at 99. In this case, the position of patrol officer in the City of Hartford is agreed to call for more than performing restricted lifting and only sedentary work.  <u>See</u> <u>McBride</u>, 583 F.3d at 98. Here, Palmieri does not contend that, at the time of his termination, he could have gone out on patrol as an officer and perform the functions expected of such an officer, as evidenced by his contention that he would later be able to "return" to such a position. <u>See</u> Pl.'s Memo. Opp. Mot. Summ. J. at 26 ("The evidence shows that had the defendant allowed him to remain in the light duty, within a month later, the plaintiff would have been able to perform and return to the position[ ] of patrol officer.")  While both parties could have been far more explicit in their enumeration of the essential functions at issue, it is clear there is no issue of material fact as to whether, at the time of termination and without accommodation, Palmieri could have performed the essential functions of a patrol officer.  <u>See</u> <u>Id</u>.; <u>see also</u> Def.'s Reply at 8 ("[A]t the time [Palmieri's] probationary period was ended, the plaintiff had provided no indication as to when (or if) he would be able to perform the essential functions of his job with or without a reasonable accommodation.  Rather, his release to work indicated he was restricted

to lifting seven pounds, had to perform sedentary work and could not carry his weapon.").

Palmieri asserts that he requested two types of reasonable accommodation from the City of Hartford.  First, he requested reasonable accommodation in the form of a light duty position.  Second, he requested reasonable accommodation in the form of a leave of absence.  See Pl.'s Memo. Opp. Mot. Summ. J. at 28 ("Plaintiff requested reasonable accommodations, including a leave of absence and light duty positions, because he was unable to bend due to his disability.").

The court turns first to the issue of the light duty accommodation.  Palmieri argues that, at the time of his termination, he was otherwise qualified for his position because he was placed on temporary light duty and was able to perform the essential functions of that position (namely, checking the mileage on police vehicles).  See Pl.'s Memo. Opp. Mot. Summ. J. at 26 ("Plaintiff was terminated while on a light duty position.  It is undisputed that plaintiff could perform the essential functions of the light duty position and there is no evidence that the defendant was under any hardship in providing this light duty position to the plaintiff.").  Palmieri appears to argue that, because he was given an accommodation of light duty work, the law requires only that he be otherwise qualified for the essential functions of that light duty work.  This argument confuses two separate, but related issues.

"Discrimination in violation of the ADA includes, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  McBride, 583 F.32 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)).  "In the context of the ADA, reasonable accommodation may include,

inter alia, modification of job duties and schedules, alteration of the facilities in which a

job is performed, acquisition of devices to assist the performance of job duties, and,

under certain circumstances, 'reassignment to a vacant position.'" Id. at 97 (quoting 42

U.S.C. § 12111(9)(B)).  Because "a reasonable accommodation can never involve the

elimination of an essential job function," a plaintiff proposing an alternative arrangement

(as opposed to a reassignment) still carries the burden of demonstrating that he can

perform the essential functions of the original job.  McMillan v. City of New York, 711

F.3d 120, 127 (2d Cir. 2013).  "After the essential functions of the position are

determined, the plaintiff must demonstrate that he or she could have performed these

functions, with or without reasonable accommodation, at the time of the termination or

discipline."  Id.  The court notes that, "[t]his burden is not heavy: it is enough for the

plaintiff to suggest the existence of a plausible accommodation, the costs of which,

facially, do not clearly exceed its benefits."  Id. (internal quotations and citations

omitted).

         In other words, simply because Palmieri was given light duty does not alter the

essential functions of his job as a patrol officer.  See, e.g., Uhl v. Home Depot U.S.A.,

Inc., No. 08-CV-3064(JS)(ETB), 2010 WL 3282611, *5 (E.D.N.Y. Aug. 13, 2010) ("At

most, Mr. Uhl has shown that, when he faced similar medical restrictions in 2003, Home

Depot crafted a 'light duty' position that enabled him to work while excusing him from

some undisputed essential functions of a Sales Associate position.  But, contrary to Mr.

Uhl's belief, this does not mean that Home Depot previously gave him a 'reasonable

accommodation,' that it must afford him again.  Instead, it supports that Home Depot

previously exceeded its legal obligations, by affording him a more than reasonable

accommodation. Home Depot's prior, voluntary effort to accommodate Mr. Uhl in excess of its legal obligations is admirable.  But it does not compel Home Depot to continue to accommodate him beyond what the law requires.") (citing Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir. 1997); Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 671 (3d Cir. 1999)); see also Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001) ("[E]vidence that accommodations were made so that an employee could avoid a particular task merely shows that the job could be restructured, not that the function was non-essential.  To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers.") (internal quotations and citations omitted).

While he does not frame it as such, Palmieri's analysis is based on cases related to a second, distinct issue -- that the light duty position was a reasonable accommodation because it reassigned him to a vacant position with a separate set of essential functions.  However, the Second Circuit has considered a case reasonably similar to the instant one and has foreclosed such an argument when the position in question -- the light duty assignment -- was admittedly created just for the plaintiff in response to his requests.  See Graves v. Finch Pruyn & Co., Inc. 457 F.3d 181, 186-7 (2d Cir. 2006).  The Graves court held:

> Graves further contends that as a reasonable accommodation in January 2001, Finch Pruyn should have 'reassigned' him to a new, sedentary desk job in the quality-assurance department rather than offering this position only as a temporary job for a few weeks to give Graves an income stream after his election of disability retirement.  The ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, 42 U.S.C. § 1211(9)(B), but the ADA does not require creating a new position for a disabled employee.  Graves concedes that the sedentary position he desired was created at his

27

request after his election of disability retirement.  Given that the ADA does not require creating a new position for Graves at all, we fail to see how it can dictate the duration of a new position that his employer created for him as a matter of grace.  We hold that the ADA did not require Finch Pruyn to give Graves this new position for any longer than it did.

Id. (internal quotations and citations omitted).  There is no evidence here that the temporary light duty position here was a "reassignment" within the ambit of the ADA, which would somehow alter the essential job functions required of Palmieri.  Accordingly, as relates to his claim of a reasonable accommodation regarding his light duty position, Palmieri has not established a prima facie case because he cannot show he was otherwise qualified for his patrol officer position.

The court next turns to the question of whether Palmieri was otherwise qualified for his patrol officer position with his requested accommodation of a leave of absence.

The parties do not appear to dispute that Palmieri made a request for a leave of absence, although the particular facts surrounding this leave are somewhat unusual.  On June 4, 2009, Palmieri requested leave retroactively from March 22, 2009, through an end date that was "unknown pending surgery."  Pl.'s 56(a)(2), Disputed Facts ¶ 21, Def.'s Reply at 17.  That leave was approved.  Id.  However, three weeks after the surgery, Palmieri returned to work because he was informed of possible problems with his health insurance benefits, after which he was placed on light duty.  Pl.'s 56(a)(2), Disputed Facts ¶ 27, Def.'s Reply at 17.  It does not appear that Palmieri requested a leave of absence a second time.  Instead, in Palmieri's Affidavit, he states that, "My leave of absence was not accommodated because it was cut short and I suffered an adverse employment action for being absent due to a disability, as well as not following directives while I was out on a leave of absence for a disability."  Palmieri Aff. at ¶ 50.

28

Courts in this Circuit have held that, "Although a temporally-defined leave of absence may constitute a reasonable accommodation, an employer is not required to place an employee on indefinite leave, awaiting the day when the employee might recover sufficiently from his disability to return to work." Dansler-Hill v. Rochester Institute of Technology, 764 F.Supp.2d 577, 583 (W.D.N.Y. 2011); see also Graves, 457 F.3d at 186 n. 9 ("We note that courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work.");[7] Stamey v. NYP Holdings, Inc., 358 F.Supp.2d 317, 325 (S.D.N.Y. 2005). It is not entirely clear to what extent Palmieri's leave request, which was meant to extend until recovery from a surgery that was not scheduled as of the time of the request, was unreasonably indefinite. The court notes that some courts in this circuit have reasoned that a plaintiff's inability to precisely specify the date of return does not make his request for leave unreasonable. See Sclafani v. PC Richard & Son, 668 F.Supp.2d 423, 445 (E.D.N.Y. 2009) ("Although the return date was dependent on her doctor's recommendation, that does not make the request unreasonable."); Powers v. Polygram Holding, Inc., 40 F.Supp.2d 195, 202 (S.D.N.Y. 1999) ("[N]o person recovering from clinically diagnosed mental illness, especially while suffering symptoms of this illness, can give an absolute date as to when his symptoms will ameliorate to the point that he will be able to return to work. To

---

[7] The court in Graves mentioned, but did not explicitly decide, the question of whether a finite unpaid leave of absence can ever be a reasonable accommodation. Graves, 457 F.3d at 186 n. 5. The court noted that the concept of leave presents an intellectual problem in that being absent does not convert an employee into suddenly being able to perform the essential functions of the job; indeed, an absence removes the employee from the job entirely. Id. However, the court cites other authorities, with seeming (although not explicit) approval, suggesting that a literal reading of the ADA is inappropriate given the general acceptance of some leaves of absences. Id. This court sees no reason to regard finite leaves of absences as a per se unreasonable accommodation.

require such certainty, and to read such a requirement into the principle that an employer need not wait an indefinite period for an accommodation to achieve its intended effect would be to eviscerate much of the protection afforded under the ADA."); Rogers v. New York University, 250 F.Supp.2d 310, 315 (S.D.N.Y. 2002) (holding that the defendant's argument that the predicted return date was too indefinite raised an issue of fact for trial).

Here, Palmieri was granted a leave of absence, but returned to work, ostensibly to save his health insurance.  It is not clear that health insurance is a part of an employer's obligation to provide reasonable accommodation through a leave of absence (indeed, most cases speak in terms of the reasonableness of "unpaid" leaves of absences, much less paid leaves with benefits), nor is it clear what would have happened to Palmieri if he had simply remained on un-benefitted leave until the point of his recovery.  At any rate, there is no evidence Palmieri requested an extension or continued leave.  The only evidence that some sort of end date was envisioned is a doctor's assessment from early September 2009, indicating the doctor hoped to have Palmieri return to work in about three months.  See Doc. No. 47-5, Ex. KK, at 62.  It is not clear from the record before the court if this information was communicated with the City of Hartford.

While it may, perhaps, seem unfair to reason that Palmieri's return to work (based on a desire to preserve health insurance) makes his expectation of a further leave of absence (which he did not ask for) unreasonable, it is the plaintiff that bears the burden of proving that an accommodation exists that permits him to perform the job's essential functions.  See Jackan v. New York State Dept. of Labor, 205 F.3d 562, 566

30

(2d Cir. 2000).  Accordingly, Palmieri cannot show that a reasonable accommodation existed that would permit him to otherwise qualify for his position as a patrol officer.  He has therefore failed to make out a prima facie case of disability discrimination.  Accordingly, the court grants the defendant's Motion for Summary Judgment as to the ADA disability discrimination count.

   B.  CFEPA: DISABILITY DISCRIMINATION

   Palmieri also brings a disability discrimination claim under CFEPA.  "Although the CFEPA applies more broadly than the ADA, the evidentiary standards for the two statutes are the same, and they are therefore often examined in conjunction."  Buotote v. Illinois Tool Works, 815 F.Supp.2d 549, 557 n.10 (D. Conn. 2011); see also Buck v. AT&T Servs., Inc., No. 3:08cv1619(JCH), 2010 WL 2640045, *1 n. 1 (D. Conn. June 28, 2010) ("Connecticut courts generally analyze ADA and CFEPA claims under the same standard.").  Accordingly, for the reasons outlined above (see Section IV.A.), the court grants the City of Hartford's Motion for Summary Judgment as to Palmieri's CFEPA disability discrimination claim.

   C.  ADA: RETALIATION

   Palmieri also brings a claim of retaliation under the ADA.  "The ADA makes it unlawful for an employer 'to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter.'" Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 222 (2d Cir. 2001) (quoting 42 U.S.C. § 12203(b).  "The ADA further renders it unlawful for an employer to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this chapter.'"  Id. at 222-23 (quoting 42 U.S.C. § 12203(a)).  Retaliation

claims under the ADA are analyzed under the familiar burden-shifting framework.  Id. at

223.  As this Circuit has stated:

> In order to defeat a motion for summary judgment addressed to a claim of retaliation, the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find (1) that [ ]he engaged in protected participation or opposition under the ADA, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive plated a part in the adverse employment action.

Id. (internal quotation omitted).

The City of Hartford argues that Palmieri cannot establish a prima facie case

because his claim is based on the allegation, "that he requested an accommodation for

his back condition and was refused it and terminated instead."  Def.'s Reply at 1.  The

City of Hartford asserts that this simply does not constitute protected activity within the

context of the ADA because Palmieri does not assert that the adverse employment

action resulted from his participation in an ADA investigation, proceeding, or hearing.

Id.  The City of Hartford does not point to any case law holding that such activity does

not qualify as protected activity, and the court notes that other courts have found to the

contrary.  See, e.g., Bayonne v. Pitney Bowes, Inc., No. 3:03CV712 (WWE), 2004 WL

213168, *2 (D. Conn. Jan. 27, 2004) ("Another example of protected activity is a

'request for a reasonable accommodation.'") (quoting Conley v. United Parcel Service,

88 F.Supp.2d 16, 20 (E.D.N.Y. 2000).

The City of Hartford does not otherwise dispute that Palmieri has established a

prima facie case, but instead argues that it has offered a legitimate business reason for

its termination of Palmieri, namely that Palmieri was insubordinate and failed to comply with five direct orders.  Palmieri argues that its presented evidence of pretext -- the negative comments made by Bernier, McCoy, and Bergenholtz -- raise a material issue of fact as to retaliatory intent.  The court agrees with Palmieri and finds the comments do raise a material issue of fact that the City of Hartford's purported reasons for termination were pretext for retaliation.  Accordingly, the court denies the Motion for Summary Judgment as to the ADA retaliation claim.

D.  CFEPA: Retaliation

As noted above (see section IV.B) because ADA and CFEPA claims are generally analyzed together, the court also denies the Motion for Summary Judgment as to the CFEPA Retaliation claim for the reasons stated in section IV.C.

E.  FMLA: Retaliation

Palmieri also brings a claim for retaliation under the FMLA.  Retaliation claims under the FMLA are likewise analyzed under the familiar burden-shifting framework.. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  "In order to make out a prima facie case, he must establish that (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  Id.  The court notes that the City of Hartford's arguments are addressed to the issue of FMLA interference and are, as such, not particularly responsive, although its arguments regarding ADA and CFEPA retaliation

are certainly related.[8]

There is no doubt here that Palmieri is qualified under the FMLA (which is distinct from the ADA and CFEPA).  For reasons identical to those outlined in its discussion relating to the ADA retaliation claim (see section IV.C), the court finds there is a material issue of fact as to whether the City of Hartford retaliated against Palmieri for requesting leave under the FMLA.  Accordingly, the court denies the motion for Summary Judgment as to the FMLA retaliation claim.

F.  ADA and CFEPA: Punitive Damages

Finally, the City of Hartford seeks summary judgment as to the issue of punitive damages against a municipality under the ADA and CFEPA.  Palmieri does not appear to contest that such damages are not available.  Courts have found that punitive damages against municipalities are unavailable under the ADA.  See, e.g., Worthington v. City of New Haven, No. 3:94-CV-00609(EBB), 1999 WL 958627, *16 (D. Conn. Oct. 5, 1999) ("Most courts hold that [42 U.S.C. § 1981a(b)(1)] does not permit punitive damages to be imposed in an ADA or Section 504 suit against a federal, state, or local government entity.") (citing, inter alia, Boyajian v. Runyon, No. CIVA3:93CV1959(AWT), 1998 WL 29921, *1 (D. Conn. Apr. 15, 1998)).  The same holds true for the CFEPA. See Meucci v. City of Hartford, No. 3:11cv766(JBA), 2013 WL 951722, *3 n. 6 (Mar. 12, 2013) ("Defendant also argues that Plaintiff may not recover punitive damages against a municipality under either the ADA or the CFEPA, which is correct.").  Accordingly, the court grants the Motion for Summary Judgment as to the claim for punitive damages.

---

[8] The court mentions this merely to note it does not have the benefit of direct briefing from the City of Hartford on the FMLA retaliation issue.

V.     **CONCLUSION**

For the foregoing reasons, the court **grants in part and denies in part**

Defendant's Motion for Summary Judgment (Doc. No. 39).  The court also **grants**

Palmieri's Motion for Permission to File a Sur-Reply Brief (Doc. No. 55).  The retaliation

claims under the ADA, CFEPA, and FMLA remain pending for trial.

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of May, 2013.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge